## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | | |
|---|---|---|
| **TERADATA US, INC. and** **TERADATA OPERATIONS, INC.** | : | Civil Action No.   3:24-cv-02878-MGL |
| | : | |
| Plaintiffs, | : | **COMPLAINT FOR TEMPORARY** **RESTRAINING ORDER AND** **PRELIMINARY AND PERMANENT** |
| **vs.** | : | **INJUNCTION AND** **MONETARY DAMAGES** |
| **CERULIUM CORPORATION** | : | |
| | : | |
| Defendant. | : | |

Plaintiffs Teradata US, Inc. and Teradata Operations, Inc. (collectively, "Teradata") state the following against Defendant Cerulium Corporation ("Cerulium") ("Defendant") in support of a claim for a temporary restraining order, preliminary and permanent injunction, and monetary damages:

### PARTIES

1.     Teradata US, Inc., is a wholly owned subsidiary of Teradata Corporation and is a corporation organized under the laws of the State of Delaware. Teradata US, Inc. owns all Teradata intellectual property worldwide. Its global headquarters is located at 17095 Via del Campo, San Diego, California 92127.

2.     Teradata Operations, Inc., is a wholly owned subsidiary of Teradata Corporation and is a corporation organized under the laws of the State of Delaware that conducts the business operations of Teradata. Its global headquarters is located at 17095 Via del Campo, San Diego, California 92127.

3.     Cerulium is a corporation organized under the laws of the State of Florida with its principal place of business in South Carolina.

4.     Blue Cross and Blue Shield of North Carolina ("BCBS"), a non-party, is an independent licensee of the Blue Cross and Blue Shield Association and maintains its principal place of business in Durham, North Carolina.

## JURISDICTION AND VENUE

5.     Subject matter jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332 because the parties are residents and citizens of different states and the amount in controversy exceeds $75,000.00.

6.     Subject matter jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331 because this action implicates laws arising under the statutes of the United States, namely, 18 U.S.C. § 1836, *et seq.* and 17 U.S.C. § 101, *et seq.*

7.     Venue and personal jurisdiction are proper in this Court because a substantial part of the events or omissions giving rise to the claims made in this action occurred in South Carolina, and Defendant is domiciled in South Carolina.

## FACTS

**Background on Plaintiff Teradata**

8.     Teradata offers a platform for complex data analytics in public and private cloud and on-premises environments.

9.     Originally founded in 1979, Teradata developed the world's first commercially available massively parallel processing system for enterprise-level data warehousing and complex analytical applications.

10.     A massively parallel processing (MPP) architecture enables a computing environment to divide all of the data-analytics and data-storage tasks requested of it, no matter how complex the request, into smaller sub-tasks that can be executed independently and in parallel by any number of execution engines within the environment, ultimately leading to much faster outputs in complex analytical environments.

11.     Today, Teradata continues to leverage the MPP technology it created to provide on-premises systems in the form of purchased or leased hardware-platform technology packaged with licenses to its proprietary data analytics and warehousing software, in addition to its platform-as-a-service offerings in the public and private clouds.

12.     Across its global customer base, which includes the world's largest companies in many consumer-facing industries—banking, retail, travel, communications, healthcare, shipping and logistics—Teradata's platforms manage trillions of digital interactions every day, often touching on nearly every operational aspect of the customer enterprise.

13.     Within its analytics and data platform offerings, Teradata provides both on-premises hardware-based and remote cloud-based analytics and data warehousing solutions, powered by its MPP database software technology, as well as software-based solutions that support database management services, backup/archive/restore services, system and network management services, and analytics services.

14.     Teradata's database software is architected specifically to allow companies to scale the size of the database and the number of concurrent users running analytical queries against it to meet growing analytics and data-storage demands, almost without limitation.

15.    Teradata also provides ecosystem management software that allows companies to manage and execute queries against, and manage data across, multiple disparate types of database and data-storage systems and architectures.

16.    Teradata's customers rely on its software to analyze massive amounts of data from across their enterprises to realize, among other things, operational efficiencies, cost-savings, real-time decision-making, and analytics-driven insights among their organizational constituencies.

17.    The software that Teradata provides forms the information technology backbone of many businesses. It allows businesses to store and manage data from across the business enterprise in computing systems that also permit business stakeholders to analyze the data quickly and efficiently in real-time and act immediately on the results.

18.    Teradata's software products include tens of millions of total lines of code that have taken highly trained software and field engineers many years to develop and optimize for deployment at extreme scale across many industries and customers.

19.    Teradata's software and the underlying technologies, copyrights, trade secrets, proprietary information, and patented technologies are collectively referred to herein as the "Teradata IP."

20.    Included in the Teradata IP is Teradata's flagship analytic platform offering, Teradata Vantage, and the code associated therewith (collectively, "Teradata Vantage"). Teradata Vantage has been developed over several iterations and improvements on the software, including, as relevant here, version 16.20. Certain components of what is now Teradata Vantage were previously known by other names, such as the database management system software previously marketed as "Teradata Database." Teradata also uses the product name "ClearScape Analytics," which was publicly introduced in 2022, to identify the full suite of Teradata's proprietary in-

database analytics capabilities which were previously identified only by their individual names. Many of the functions now branded as ClearScape Analytics were included in Teradata Vantage 16.20.

21. Teradata Vantage also serves as the underlying software infrastructure for Teradata cloud services, including Teradata's platform-as-a-service offering called IntelliCloud (now discontinued) and Teradata's current public cloud offerings (on AWS, Microsoft Azure and Google Cloud), which provide data analytics and data warehousing "as a service" on a subscription basis.

22. Teradata Vantage permits end users to use industry-standard coding languages, including SQL, R, Python, SAS, and Java, to query their data platforms with tools such as Tableau, Qlik, IBM Cognos, and Dataiku and, beginning with version 16.20, to harness insights from time-series data.

23. Teradata Vantage 16.20 was first released in 2018 and, in accordance with Teradata's general support policy for such software, Teradata provides approximately three years of maintenance and support from the date the software is made generally available to customers, followed by an approximately two-year (at Teradata's discretion) extended database maintenance period.

24. During the maintenance and support phase, Teradata provides software problem resolution services, including code level maintenance and corrections or workarounds to resolve reported software problems. During the extended database maintenance period, Teradata provides maintenance for the development and distribution of critical patches and e-fixes.

25.     With respect to Teradata Vantage 16.20, the extended database maintenance period ended in February 2023, as Teradata made known to its customers via end of support life notifications and to its partners as part of their business relationships with Teradata.

26.     Teradata currently only supports Teradata Vantage 16.20 for a number of its customers on certain operating systems that meet specific business and technology-infrastructure conditions; Teradata is working with these customers to develop plans to upgrade or transition to a new Teradata offering within the next several months.

27.     There is a plethora of companies that offer or purport to offer similar software products, services or support as Teradata.

28.     It is not uncommon for an end user to try to find a replacement for a Teradata product only to discover that (1) Teradata offers a one-of-a-kind product, or (2) the entity purporting to be an expert on Teradata IP is, in fact, not a true expert, lacking the knowledge base and understanding for, as well as the training on, Teradata IP and Teradata products and services.

29.     In the latter situation, an end user receives sub-par service from an unqualified third party. This poses a serious risk to end users in the form of, *inter alia*: unsecure systems; un-patched and out-of-date software; and security vulnerabilities or breaches.

30.     When these risks materialize, end users may attribute them to Teradata and its software instead of to the unqualified third party. This results in harm to Teradata's standing in the industry and its goodwill and reputation, and it exposes Teradata to substantial potential liabilities.

31.     Given the sophistication required to support its software products, the highly competitive nature of the industry, and the risks posed by unqualified third-party support, Teradata goes to great lengths to protect the Teradata IP, especially the object code, source code, internal architecture and design of its software.

32.    Teradata does not license the software at issue (Teradata Vantage 16.20) from another party—it owns the software outright.[1] Use of Teradata software must be qualified and approved by Teradata.

33.    Relevant to this case, Teradata protects the Teradata IP with copyright registrations.

34.    Attached as Exhibit 1 is a true and accurate copy of the copyright registration TXu 2-180-487, effective December 13, 2019, entitled "Teradata Database 16.0."

35.    Attached as Exhibit 2 is a true and accurate copy of the copyright registration TXu 2-180-486, effective December 13, 2019, entitled "Teradata Database 16.1."

36.    Attached as Exhibit 3 is a true and accurate copy of the copyright registration TX 9-381-593, effective April 18, 2024, entitled "Teradata Vantage 16.2."

37.    These registrations apply to the Teradata IP at issue in this case.

**BCBS and Teradata Dispute**

38.    BCBS entered into a Master Agreement, effective 2002, with Teradata's predecessor, NCR Corporation, which subsequently assigned all rights and interests under the Master Agreement to Teradata (the "Master Agreement"). BCBS and Teradata had a business relationship pursuant to the Master Agreement (as amended from time to time) until 2023.

39.    Relatedly, effective December 18, 2017, BCBS and Teradata entered into a Teradata IntelliCloud Customer Agreement (the "IntelliCloud Agreement"), and the parties maintained a relationship pursuant to such IntelliCloud Agreement through the end of 2023.

40.    Under the Master Agreement, as is relevant here, BCBS obtained access to a Teradata Data Warehouse environment comprised of hardware components and software to use in connection with its business operations. From time to time, BCBS and Teradata would enter

---

[1] Teradata does include certain third-party components and code in its software, including open-source code.

statements of work issued under the Master Agreement and pursuant to which Teradata would provide BCBS with certain enumerated services and deliverables related to BCBS's Teradata Data Warehouse environment.

41.    On or about June 2020, BCBS and Teradata agreed to a Teradata DBA Services Statement of Work No. 14 issued under the Master Agreement ("SOW #14"). Within SOW #14, BCBS acknowledged its use of the Teradata Data Warehouse environment, including that it would be using Teradata software version 16.20 beginning in calendar year 2020.

42.    SOW #14 had a term of three years, to expire May 31, 2023, except that such term automatically renewed for an additional three years absent 60 days' prior written notice of termination.

43.    During the term of SOW #14, BCBS used Teradata software version 16.20 in its Teradata Data Warehouse environment under the Master Agreement and with IntelliCloud.

44.    Beginning in early 2022, BCBS initiated discussions with Teradata about ending their business relationship and transitioning BCBS's data to another platform.

45.    By May 2023, after months of discussions regarding BCBS's transition away from Teradata, a dispute developed between the parties regarding the scope of transition services to be provided by Teradata, the cost of such services, and the potential renewal of the Master Agreement, SOW #14, and the IntelliCloud Agreement past May 31, 2023, to facilitate a transition.

46.    Ultimately, Teradata and BCBS resolved the dispute through a settlement agreement, governed by New York law, which they fully executed by July 31, 2023 (the "BCBS Settlement Agreement").[2]

---

[2] The agreement is not filed herewith in its entirety because it contains a confidentiality clause. It is in the possession of both BCBS and Teradata and can be submitted to the Court upon the entry of a protective order.

47.    Following the execution of the BCBS Settlement Agreement, BCBS was set to transition from Teradata's IntelliCloud and associated services by December 31, 2023, at which time BCBS would lose access to the relevant Teradata IP.

48.    Should BCBS have desired to use Teradata services or the Teradata IP after December 31, 2023, BCBS would have had to reach an agreement with Teradata and compensate Teradata for such services at an agreed-upon rate.

49.    BCBS and Teradata have not reached any other agreement or understanding overriding, modifying, or amending the terms of the BCBS Settlement Agreement.

50.    Upon information and belief, instead of approaching Teradata about an extension or another possible solution (such as to revisit the plan both companies had previously worked on to migrate BCBS to a Teradata cloud environment), BCBS contracted with Cerulium, which was willing (though not authorized) to provide Teradata IP in a software-as-a-service ("SaaS") business model to BCBS.

**Cerulium Begins Hawking the Teradata IP**

51.    Unlike Teradata, Cerulium does not own or develop enterprise database software—it licenses or buys software from companies like Teradata and then resells, re-licenses or sublicenses it as a reseller, subject to particularized terms, conditions, and licenses required by the software owner.

52.    The relationship between Teradata and Cerulium dates back to at least 2009 and involved the execution of a number of agreements between the two.

53.    The parties' relationship also involved a data migration for another customer that began in or around Summer 2022 (the "Data Migration"), where Cerulium was given access to Teradata physical servers and software, in its capacity as a retained vendor.

54.     None of these contracts or previous business interactions give Cerulium any right to provide BCBS Teradata IP through a SaaS offering.

55.     Cerulium is not authorized to provide software support to third parties for any Teradata product or system, is not authorized to use the Teradata IP to provide service bureau activities (including in a SaaS type offering), and is not authorized to sublicense or make the Teradata IP available to third parties in this manner or for this purpose. Similarly, BCBS does not have a license for Teradata Vantage 16.20.

56.     Teradata has entered into several contracts with Cerulium, including a Master Consulting and Systems Integration Partner Agreement ("Partner Agreement") and a Teradata Master Reseller Agreement ("Reseller Agreement"). They are both governed by New York law.

57.     The Partner Agreement, dated November 23, 2009, governed how Cerulium could use software provided by Teradata to train its employees and demonstrate Teradata's software to jointly targeted customers. A true and accurate copy of the Partner Agreement is attached as Exhibit 4.

58.     The Partner Agreement specifically denied Cerulium any rights to "sublicense, sell, rent, loan, make available or assist third parties to use the Teradata Software," and also prohibited Cerulium from "us[ing] the Teradata Software for service bureau activities or otherwise mak[ing] the Teradata Software available on a time sharing basis." (Ex.4, Partner Agreement, § 3.2).

a.     The Partner Agreement further provided that, if Cerulium desired to obtain (and Teradata was willing to provide) "a license for [Cerulium] to use the Teradata Software for any other uses beyond the scope of this Agreement, Teradata and [Cerulium] must enter into a separate written agreement to be signed by both parties.") (*Id.* at § 3.4).

b.     The Partner Agreement also expressly stated that "[Cerulium] obtains no rights to the Teradata Software other than the license expressly granted in Section 3.1, and no other licenses or rights to the Teradata Software will be implied." (*Id.* at § 3.5).

c.     The Partner Agreement also contained a Confidentiality provision, which prohibited the disclosure of any confidential business information, including any Teradata Software, exchanged between the parties. (*Id.* at § 7.1).

59.     The Reseller Agreement, dated November 9, 2021, provided a framework under which Cerulium could remarket Teradata products and services to "End Users." A true and accurate copy of the Reseller Agreement is attached as Exhibit 5.

60.     The Reseller Agreement permitted Cerulium to sublicense certain specified Teradata IP, if, and only if, the stringent requirements of the Reseller Agreement were met. These requirements included:

a.     Approval of a purchase order between Cerulium and Teradata for the relevant Teradata IP and End User (Ex. 5, Reseller Agreement, § 2);

b.     Cerulium's promise not to use any of Teradata's "Confidential Information" or "Products," including any Teradata Software, to compete with Teradata (*Id.*);

c.     Completion of an End User License Agreement for customers that did not have an agreement directly with Teradata (*Id.* at § 8.1);

    d.    All Cerulium's "License Rights to Software are limited to those expressly set forth in this Agreement, and no license rights will be implied." (*Id.* at § 8.4);

    e.    An express acknowledgement that "Teradata will be responsible for providing all installation, maintenance and support, software upgrades, and professional services." (*Id.* at § 9); and

    f.    A provision prohibiting the unauthorized disclosure of confidential and proprietary business information exchanged between the parties. (*Id.* at § 18).

61.    With respect to BCBS, Cerulium has undertaken none of these steps. Regardless, under no circumstance are Cerulium's actions here—using Teradata IP to provide service bureau activities to BCBS in the form of a SaaS offering—permitted.

62.    Cerulium has sold or licensed, made available, and assisted BCBS in using Teradata software, and has done so to compete with Teradata—actions specifically prohibited by the Partner and Reseller Agreements.

63.    In short, Cerulium has (1) infringed and misappropriated Teradata's IP, (2) proceeded to hawk this Teradata IP to BCBS, and (3) breached its contracts with Teradata in the process.

**Misappropriation and Infringement of Teradata IP**

64.    BCBS did not reach any agreement with Teradata to receive additional services, including access to or use of the relevant Teradata IP, after December 31, 2023.

65.    BCBS has not paid Teradata for any access to or use of the Teradata cloud services since December 31, 2023.

66.     Cerulium initially had access to some Teradata IP for certain purposes by virtue of Cerulium's business relationship with Teradata, as evidenced by the Partner and Reseller Agreements.

67.     Upon information and belief, Cerulium also gained access to Teradata IP in connection with the Data Migration.

68.     Upon information and belief, Cerulium was capable of providing BCBS with Teradata IP through an as-a-service offering, an unpermitted purpose, because it accessed Teradata's Partner Network and downloaded multiple Teradata software packages, including Teradata Vantage 16.20, in or around May and June of 2023.

69.     Cerulium's CEO, Steve Wilmes, admitted during phones calls with Teradata in or around August 14th and 29th, 2023, that Cerulium was providing both hardware support for Teradata IP and providing software support for Teradata IP to third parties, including by accessing the Teradata Partner Network to download software fixes.

70.     By letter dated September 22, 2023, Teradata confronted Cerulium about its software downloads (which, at the time, Teradata did not know were, at least in part, for the benefit of BCBS) and demanded that Cerulium immediately cease accessing the Teradata Partner Network and return or certify destruction of any Teradata software in Cerulium's possession.

71.     In early 2024, Teradata personnel became suspicious that BCBS may have been receiving copies of or access to Teradata software and software support services from Cerulium.

72.     This was memorialized in a letter, dated March 1, 2024, a true and accurate copy of which is attached as Exhibit 6.

73.     In the March 1st letter, Teradata expressly requested confirmation from Cerulium that Cerulium was not providing BCBS with software support for any Teradata products or

services, and that Cerulium was not using Teradata software to conduct service for, or on behalf of, BCBS. Cerulium never provided the requested confirmation.

74.     Notwithstanding the March 1st letter from Teradata, upon information and belief, Cerulium and BCBS have continued apace, and Cerulium is continuing to infringe and misappropriate Teradata IP to provide a SaaS offering to BCBS.

75.     Indeed, on a March 14, 2024 telephone call with Teradata personnel, Cerulium confirmed it was providing Teradata software via this SaaS offering to BCBS.

76.     On April 23, 2024, Teradata sent Cerulium another letter, a true and accurate copy of which is attached as Exhibit 7, demanding that it cease and desist from using Teradata software to service BCBS, and that it deliver written certification of the same to Teradata. Cerulium failed to provide the requested certification.

77.     Given Cerulium's blatant infringement of Teradata's rights, Teradata has been forced to initiate this action seeking injunctive relief and damages.

78.     If a preliminary injunction is not entered against Cerulium, Teradata will be irreparably harmed by virtue of the unlawful use and SaaS offering of the Teradata IP.

79.     Cerulium's continued use of the Teradata IP and provision of the Teradata IP through SaaS offerings, including to BCBS, creates customer confusion in the marketplace and harms Teradata's reputation by creating the perception that the Teradata IP is properly supported by Teradata, thus inviting other third-party providers to follow Cerulium's lead to offer unauthorized and unsupported Teradata IP on an as-a-service basis.

80.     There is no adequate remedy at law to properly compensate Teradata for Cerulium's wrongful and unauthorized use of its property—Cerulium must be enjoined.

## COUNT I – COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 101, *et seq.*

81.     Teradata incorporates all previous allegations as if fully restated herein.

82.     Teradata is the owner of the Teradata IP and all rights thereto, including all related copyrights.

83.     Attached as Exhibit 1 is a true and accurate copy of the copyright registration TXu 2-180-487, effective December 13, 2019, entitled "Teradata Database 16.0."

84.     Attached as Exhibit 2 is a true and accurate copy of the copyright registration TXu 2-180-486, effective December 13, 2019, entitled "Teradata Database 16.1."

85.     Attached as Exhibit 3 is a true and accurate copy of the copyright registration TX 9-381-593, effective April 18, 2024, entitled "Teradata Vantage 16.2."

86.     Teradata is entitled, under 17 U.S.C. § 106, to the exclusive right to use and to authorize the reproduction, distribution, performance and display of works based on the copyrighted work.

87.     Cerulium has infringed Teradata's copyright in the Teradata IP at least by improperly and continuous copying, reproducing, utilizing, and deploying (without authorization) the copyrighted Teradata IP, at least through the date of this Complaint, without the authorization of Teradata.

88.     Cerulium has knowingly copied the copyrighted Teradata IP and provided Teradata IP to, at least, BCBS on a consistent basis since October 2023, without Teradata's approval or authorization.

89.     By knowingly copying, reproducing, using, performing, displaying, distributing and/or selling and offering for sale unauthorized copies of the Teradata IP, Cerulium has infringed

and continues to infringe Teradata's copyrights in violation of 17 U.S.C. § 101, *et seq.,* thereby damaging Teradata.

90.    Cerulium's infringement has been willful, knowing, and deliberate, and there is no written license agreement permitting Cerulium to provide the services to BCBS it is currently providing.

91.    Unless enjoined by this Court, Cerulium will continue its course of conduct and will continue to wrongfully, willfully, and deliberately copy, distribute, sell, infringe and/or otherwise profit from Teradata's copyrighted works.

92.    As a direct and proximate result of Cerulium's conduct, Teradata has already suffered and will continue to suffer irreparable harm. Teradata has no adequate remedy at law to redress the injuries that Cerulium's continuing conduct would cause.

93.    As provided in 17 U.S.C. § 504(b), Teradata is also entitled to recover actual damages and the disgorgement of all profits Cerulium has made as a result of its wrongful conduct.

94.    Alternatively, Teradata is entitled to statutory damages pursuant to 17 U.S.C. § 504(c). In addition, because Cerulium's infringement has been willful within the meaning of the Copyright Act, any award of statutory damages should be enhanced pursuant to 17 U.S.C. § 504(c)(2).

95.    Teradata is also entitled to recover its full costs of suit and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

## COUNT II – MISAPPROPRIATION TRADE SECRETS UNDER 18 U.S.C. § 1836, *et seq.*

96.    Teradata incorporates all previous allegations as if fully restated herein.

97.    Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, this Court may act in equity to enjoin threatened misappropriation of trade secrets.

98.     In connection with the development of its business, Teradata has expended substantial time, labor, money, and other resources to generate the Teradata IP.

99.     Cerulium was provided access to and used the Teradata IP in connection with its responsibilities in the Data Migration project that began in 2022.

100.     Cerulium accessed Teradata's Partner Network and downloaded multiple Teradata software packages, including Teradata Vantage 16.20.

101.     Cerulium has misappropriated such Teradata IP by providing it on an as-a-service basis to BCBS (and perhaps other end users) and by using such Teradata IP for that purpose and against the explicit instruction of Teradata and in violation of express contractual provisions.

102.     Teradata has taken substantial measures and exercised significant diligence to prevent the Teradata IP—including its business-related trade secret documents and information—from becoming available to persons other than those it has authorized for purposes of furthering its business.  Such measures and diligence include, but are not limited to, confidentiality provisions such as those present in the Partner Agreement and the Reseller Agreement.

103.     Cerulium's conduct breached those confidentiality provisions.

104.     Cerulium knew or had reason to know that its misappropriation of the Teradata trade secret information breached the confidentiality provisions of the Partner Agreement and the Reseller Agreement, and that its conduct exceeded the scope of its authorization to access and use such trade secret information, including the Teradata IP.

105.     Cerulium is using and continues to use the trade secret information of Teradata to unfairly and illegally compete with Teradata.

106.    Unless Cerulium is preliminarily and permanently enjoined from misusing, converting, disclosing, and misappropriating Teradata's trade secret information, Teradata will suffer immediate and irreparable injury.

107.    Teradata has no adequate remedy at law.

108.    Therefore, Teradata is entitled to a preliminary and permanent injunction against the further use, possession, transfer, duplication, and disclosure by Cerulium of such trade secret information, and against any future development or activities that would or could make use of such trade secret information.

109.    As a direct and proximate result of Cerulium's unlawful conduct, Cerulium is also liable to Teradata in an amount in excess of $75,000.00, the precise amount to be determined at trial.

110.    Furthermore, Cerulium misappropriated Teradata's trade secrets knowingly, willfully, maliciously, intentionally and in bad faith so as to warrant the imposition of punitive damages and attorneys' fees in an amount to be determined at trial.

## COUNT III – MISAPPROPRIATION OF TRADE SECRETS/NY COMMON LAW

111.    Teradata incorporates all previous allegations as if fully restated herein.

112.    The Teradata IP is trade secret because it is not generally known outside of Teradata, hidden from competitors, zealously guarded by Teradata, and subject to strict contract controls, such as the confidentiality language contained in the Partner Agreement and the Reseller Agreement, as well as copyright protection.

113.    By virtue of its contracts with Teradata, Cerulium was under an express duty to safeguard (including refraining from improper use of) Teradata's confidential information and trade secrets, including the Teradata IP.

114.    Cerulium breached the duty it owed to Teradata by taking actions for its own benefit and to the detriment of Teradata.

115.    Unless Cerulium is preliminarily and permanently enjoined from misusing, converting, disclosing, and misappropriating Teradata's trade secret information, Teradata will suffer immediate and irreparable injury.

116.    Teradata has no adequate remedy at law.

117.    Therefore, Teradata is entitled to a preliminary and permanent injunction against the further use, possession, transfer, duplication, and disclosure by Cerulium of such trade secret information, and against any future development or activities that would or could make use of such trade secret information.

118.    As a direct and proximate result of Cerulium's unlawful conduct, Cerulium is also liable to Teradata in an amount in excess of $75,000.00, the precise amount to be determined at trial.

119.    Furthermore, Cerulium misappropriated Teradata's trade secrets knowingly, willfully, maliciously, intentionally and in bad faith so as to warrant the imposition of punitive damages and attorneys' fees in an amount to be determined at trial.

## COUNT IV – BREACH OF CONTRACT

120.    Teradata incorporates all previous allegations as if fully restated herein.

121.    The Partner Agreement specifically prohibits Cerulium from acting to "sublicense, sell, rent, loan, make available or assist third parties to use the Teradata Software," and also prohibits Cerulium from "us[ing] the Teradata Software for service bureau activities or otherwise mak[ing] the Teradata Software available on a time sharing basis." (Partner Agreement, § 3.2.)

122. Cerulium is making Teradata software available to BCBS through the service bureau as-a-service activity without authorization and in express conflict with Teradata's demands to cease and desist.

123. Cerulium is therefore in breach of the Partner Agreement.

124. The Reseller Agreement mandates the following:

    a.    Approval of a purchase order between Cerulium and Teradata for the relevant Teradata IP (Ex. 5, Reseller Agreement, § 2.);

    b.    Cerulium not using any of Teradata's "Confidential Information" to compete with Teradata (*Id.*);

    c.    Completion of an End User License Agreement for customers that do not have an agreement directly with Teradata (like BCBS) (*Id.* at § 8.1.);

    d.    Limiting Cerulium's "License Rights to Software are limited to those expressly set forth in this Agreement, and no license rights will be implied." (*Id.* at § 8.4.); and

    e.    Acknowledging that "Teradata will be responsible for providing all installation, maintenance and support, software upgrades, and professional services." (*Id.* at § 9.).

125. The Reseller Agreement also contains a confidentiality provision, which requires Cerulium to "use reasonable efforts to prevent the disclosure of" Teradata's confidential information. (*Id.* at § 18.)

126. Cerulium has breached all these covenants of the Reseller Agreement.

127. At all times relevant herein, Teradata has complied with and performed its obligations under the Partner Agreement and the Reseller Agreement.

20

128.    As a direct and proximate result of Cerulium's multiple breaches of the Partner Agreement and the Reseller Agreement, Teradata's intellectual property and its rights therein have been misappropriated, violated, and otherwise diminished, and Teradata is entitled to preliminary and permanent injunctive relief to prevent Cerulium's continued unauthorized disclosure and misuse of Teradata's intellectual property.

129.    As a direct and proximate result of Cerulium's multiple breaches of the Partner Agreement and the Reseller Agreement, Teradata has been damaged, in an amount to be determined at trial, anticipated to exceed $75,000.00.

## PRAYER FOR RELIEF

**WHEREFORE**, Teradata respectfully requests judgment against Cerulium as follows:

A.    A temporary restraining order, a preliminary injunction, and a permanent injunction against Cerulium, prohibiting its use of the Teradata IP and all associated materials and prohibiting it from further disbursement or offering of the confidential, proprietary, or intellectual property of Teradata more widely or otherwise assisting BCBS in doing so;

B.    An order instructing Cerulium to remove all Teradata software used on or accessible through any Cerulium system, hardware, server, data center, or other medium, and certify destruction of the same;

C.    An order that Cerulium pay statutory and compensatory damages as provided for under the relevant trade secrets and copyright laws;

D.    An order granting Teradata its reasonable attorneys' fees and expenses against Cerulium;

E.    An order granting Teradata punitive and exemplary damages against Cerulium;

F.     An order against Cerulium awarding Teradata its compensatory damages under the Reseller Agreement and the Partner Agreement; and

G.     Pre-judgment and post-judgment interest and such other legal and equitable relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Vordman Carlisle Traywick, III*
Vordman Carlisle Traywick, III (12483)
Sarah C. Frierson (13825)
ROBINSON GRAY STEPP & LAFFITTE, LLC
Post Office Box 11449
Columbia, South Carolina 29211
Telephone:  (803) 929-1400
Facsimile:  (803) 929-0300
ltraywick@robinsongray.com
sfrierson@robinsongray.com

Sean P. McCormick (*pro hac vice* to be filed)
10050 Innovation Drive, Suite 400
Miamisburg, Ohio 45342
Telephone: (937) 443-6824
Facsimile: (937) 443-6635
Sean.McCormick@ThompsonHine.com

Brian P. Lanciault, Jr. (*pro hac vice* to be filed)
300 Madison Avenue, 27th Floor
New York, New York 10017
Telephone: (212) 344-5680
Facsimile: (212) 344-6101
Brian.Lanciault@ThompsonHine.com

*Counsel for Plaintiffs*